Henry T. Roberts v. Commissioner.
Roberts v. Commissioner
Docket No. 9807.
United States Tax Court
1948 Tax Ct. Memo LEXIS 111; 7 T.C.M. (CCH) 599; T.C.M. (RIA) 48165; August 24, 1948
*111 Henry T. Roberts, the petitioner herein, on December 6, 1938, formed a corporation for the sole purpose of holding title to a farm then owned and operated by him. Title to the farm and various items of personalty thereon was transferred to the corporation by petitioner who continued thereafter to conduct the farming business in his individual capacity until the corporation was ultimately dissolved and the property sold in January, 1943. During the taxable years in question, 1938, 1939, and 1940, petitioner was also employed by the Seeburg Corporation as its vice-president and director of sales to organize and develop a national distributing system for its products. Held: 1. That for tax purposes the corporation and its sole stockholder must be regarded as separate and distinct entities. 2. During the taxable years 1938, 1939, and 1940, the business of farming was conducted solely by the petitioner in his individual capacity. In the same period the corporation held title to the farm property and did not engage in the farming business. 3. That the losses resulting from the farm business are properly deductible by petitioner as the operator of the farm business. 4. That in *112 the absence of any agreement between the petitioner and the corporation, the rental value of the corporate-owned farmhouse occupied by petitioner in 1939 and 1940 is taxable to him within the provisions of section 22 (a) as "income derived from any source whatever". 5. That petitioner may not claim deductions for taxes, license fees, and interest payments on farm mortgages in the absence of a showing that he had agreed to or was otherwise obligated to make such payments. 6. That petitioner was entitled to deduct as travel and entertainment expenses the amounts expended by him incident to his organization and development of Seeburg's distributing system. 7. That respondent's inclusion of petitioner's unidentified bank deposits, when both the sources and amounts of petitioner's income were fixed or stipulated, was error. 8. That petitioner is entitled to three deductions for contributions totaling $528.50, and the other deductions claimed were properly disallowed by respondent as petitioner has failed to substantiate his claim. 9. That petitioner's deduction taken for a bad debt was properly disallowed when evidence indicated petitioner had failed to exhaust all possibility *113 of repayment. John E. Hughes, Esq., for the petitioner. Charles D. Leist, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: This proceeding involves income tax deficiencies for the calendar years 1938, 1939, and 1940 in the amounts of $7,372.28, $16,743.16, and $32,415.19, respectively. A reduction in dependency credits for 1938 and several adjustments to taxable income for 1940 relating to rents, a $2,500 payment received from J. P. Seeburg Corporation, and $57.44 of interest expense, are not contested. The issues to be decided are set forth below and will be considered in that order: 1. Whether losses arising in 1938, 1939, and 1940 from the operation of a farm were sustained by *114 petitioner as an individual or by a corporation holding title to the property. 2. Whether the rental value of living quarters owned by the corporation and occupied by petitioner is includible in his gross income for 1939 and 1940. 3. Whether petitioner may deduct real estate and other taxes paid in 1939 and 1940, and interest payments in 1940, from his gross income for those years. 4. Whether petitioner is entitled to certain claimed deductions for traveling and entertainment expenses in 1938, 1939, and 1940. 5. Whether certain bank deposits, consisting of other than salaries and commissions received by petitioner in 1938, 1939, and 1940, are includible in his gross income for those years. 6. Whether petitioner is entitled to certain claimed deductions for contributions made in 1938, 1939, and 1940. 7. Whether petitioner is entitled to a bad debt deduction for the year 1939. Findings of Fact Petitioner, H. T. Roberts, is an individual residing in Chicago, Illinois. His income tax returns for the years here involved were filed with the collector of internal revenue for the first district of Illinois. Issue No. 1 - Losses from Farm Operations An area of farm land, *115 known as Pomeroy Farms and located near Barrington, Illinois, was originally acquired under a government land grant by the Pomeroy family. It was purchased by a Mr. Buehler about 1912 and in 1928 was split up into four farms identified by name and number as Pomeroy Farms No. 1, No. 2, No. 3, and No. 4. Except for Pomeroy Farm No. 1, the main farm of the group consisting of 130 acres, the farms were sold by Buehler's sons after his death. Petitioner, who owned another farm in the vicinity prior to 1930, personally acquired Pomeroy Farm No. 1 in the fall of 1938. In addition to purchasing the farm lands and buildings, petitioner acquired 30 registered purebred Berkshire hogs, some purebred Percheron horses, registered Guernsey cows, some sheep and chickens, tractors, farm implements, feed, and miscellaneous equipment on the premises. Petitioner bought the farm, livestock, feed, and equipment for $30,000, of which $10,000 was in payment for the personalty. With a view to retaining the exclusive use of the name "Pomeroy Farms", a name previously associated by the public with the development of purebred animals, petitioner consulted his attorney and, on the latter's advice, decided *116 to form a corporation to be known as "Pomeroy Farms, Inc." On December 3, 1938, petitioner, his wife (Faye C. Roberts) and three accommodation parties signed a pre-organization subscription agreement which provided that the corporation to be formed would have an authorized capital of 800 shares of no par value stock and that 400 shares thereof would be offered for sale at $50 per share. Petitioner subscribed for 197 shares, his wife for 200 shares, and each of the accommodation parties for one share. The agreement stated further: "* * * the principal objective and purpose for the incorporation of this corporation is to acquire the title and nominal ownership in and to a certain farm in Lake County, Illinois * * * together with the personal equipment presently located on said farm, which farm and personal property is presently owned by HENRY T. ROBERTS; that the sole purpose of incorporating is to create an artificial person in the nature of a corporation only to hold title to the land and personal property, and that for all intents and purposes the operation of said farm and the business to be connected with said farm including the sale of products, live stock, exhibitions of cattle, *117 hogs and live stock, and all other matters of business in connection therewith, shall be carried on by HENRY T. ROBERTS and FAY C. ROBERTS, as a co-partnership, and not in any sense as a corporate enterprise except only the naked holding of title to the personalty and realty and such other business enterprise as may or shall be acquired in the future by the co-partnership." Mrs. Roberts, immediately after the execution of the subscription agreement, declined to be a partner. On December 6, 1938, Pomeroy Farms, Inc., hereinafter referred to as the corporation, was duly incorporated under the laws of the State of Illinois. The first meeting of the shareholders was held on December 8, 1938, at which time petitioner, his wife, and Thomas J. Linane, one of the accommodation parties, were elected as directors. At that meeting bylaws and a corporate seal were adopted and petitioner was elected president and his wife was chosen as secretary and treasurer. In view of the fact that petitioner and his wife owned the farm and personal property located thereon, and "* * * have executed their deed of conveyance to the realty and a Bill of Sale to all of the personalty and in consideration *118 thereof are to receive 397 of the 400 issued shares of common stock of this corporation", the board of directors approved the issuance of the stock for the transfer of this property. The last item of business was recorded as follows: "The Chairman then proceeded to advise the Board of Directors that the formation of the corporation and the conveyance of the real estate and personal property hereinbefore set forth was done for the purpose of establishing an artifical person only to hold the named title to the real estate (subject to existing encumbrances) and personal property in order to more easily facilitate and carry on all of the business connected with said farm and such further activities and enterprises as might be decided upon by Henry T. Roberts in the operation and ownership of said farm, and that the creation of the corporation and its continued existence was and is only for the purpose of holding title, etc., and not for any other purpose; that the individual business shall continue and all matters pertaining to income, disbursements or otherwise, shall be maintained by HENRY T. ROBERTS for his personal business account, and the use of the corporate name shall be only *119 construed as being the vehicle of operation of his individual enterprise and not otherwise." "Thereupon, upon motion duly made and seconded, the following resolution was unanimously adopted: "RESOLVED: that HENRY T. ROBERTS be and he is hereby authorized to receive all income which may or shall accrue to this corporation, and make all disbursements of sale of assets consisting of personal property, as he may elect, and shall execute all conveyances of personal property or real estate in the name of this corporation signed by him as President, and indicate that such sale or conveyance is being made in such capacity as accommodating and facilitating his act in the operation of this business enterprise. "RESOLVED FURTHER: that nothing herein contained shall be deemed as intending to defeat at this time or at any time in the future the right of any creditor to charge the corporation for any indebtedness or other charge which may or shall be owed by the corporation, by said corporation holding forth to the world its corporate assets." The 400 shares of stock were duly issued on December 8, 1938, to the persons and in the amounts specified in the subscription agreement, and the real *120 and personal property was conveyed to the corporation by petitioner and his wife. On the same date petitioner's wife and the accommodation parties endorsed over and transferred their respective stock interests to petitioner. At the time the property was transferred to the corporation, the real estate was subject to a first mortgage in favor of the First Federal Savings and Loan Association of Chicago, Illinois, in the amount of $10,000. By authority conferred in a joint meeting of the board of directors and all shareholders, held on April 6, 1939, a loan of $5,000 was negotiated by the corporation from the loan association. The existing mortgage was supplanted by a first mortgage of $15,000 for a 15-year term at 5 1/2 per cent interest. Chattel mortgages in unknown amounts were likewise executed as additional security for the payment of the first mortgage. The purpose of entering this transaction was to acquire funds to be used for the repair and remodeling of a building on the farm. At a special joint meeting of the shareholders and board of directors held on or about September 4, 1939, the purchase by the corporation of Pomeroy Farm No. 2 for $10,000 was authorized. The corporation *121 was also authorized by resolution to borrow $7,000 from the First Federal Savings and Loan Association of Chicago, and to place a mortgage on the newly acquired property in that amount. The purchase and execution of the mortgage loan were duly performed by petitioner and his wife as corporate officers. By separate meetings of the stockholders and the board of directors held on July 18, 1941, the sale of Pomeroy Farm No. 2 by the corporation for $15,000 was approved. After acquiring Pomeroy Farm No. 1, petitioner continued the business of raising purebred animals. He traveled throughout many midwestern states and by 1940 had increased his herd of hogs from the original 30 to approximately 300 purebred Berkshires. Petitioner adopted the practice of going on extended purchasing tours for several days at a time, during which he would buy the hogs and immediately truck or ship them back to the farm. Very few of these purchases involved the use of bills or invoices. The newly acquired hogs were registered with the American Berkshire Association, Springfield, Illinois, in petitioner's name. Petitioner also traveled extensively from Texas to Minnesota in order to acquire purebred cattle. *122 As a result, he accumulated a herd of 75 Hereford bulls and heifers, using his personal funds to make the purchases. Petitioner was a member of the American Hereford Association of Kansas City, Missouri. He registered the cattle with the Association in his own name although membership was not necessary in order to secure the registration of cattle. Petitioner exhibited his animals under the name of "Pomeroy Farms, H. T. Roberts", at numerous fairs throughout the country during the taxable years, winning a large number of prizes, ribbons, and other honors. He also paid the bills covering expenses incurred in transporting, feeding, and displaying the livestock during the annual fair season. Some printed circulars and occasional advertisements in farm magazines describing livestock available for sale or breeding purposes used the corporate name. During the period before us, numerous capital improvements were added to the farms, including a new barn, a new cottage, gravel roads, and cement curbing, landscaping, new fences, a new water system, and other general repairs. These improvements, in addition to the other expenses of farm operations, were paid for with funds derived from loans, *123 Roberts' independent income, and from the gross receipts arising out of the farming business. In connection with the purchase of materials and supplies needed for the operation and improvement of the farms, statements and invoices were customarily rendered by the vendors. The great majority of those received in 1939 and 1940 were addressed to H. T. Roberts, Pomeroy Farm, or a combination thereof. Prior to incorporation, some materials were billed to "Pomeroy Farms". While much of the income correspondence regarding livestock or catalogs was addressed to petitioner, approximately 125 letters were addressed to "Pomeroy Farm, Barrington, Illinois". Subsequent to December 8, 1938, the corporation maintained a stock record and minute book. No books of account or records were kept by the corporation with respect to the farming operations. Petitioner kept no formal records of his farming business other than his checkbooks, cancelled checks, bills, and receipts. The corporation did not at any time file Federal income tax or capital stock tax returns. Annual reports were rendered by the corporation to the Secretary of State of Illinois as required by law, and petitioner personally paid *124 the state and local taxes on the real estate. Petitioner maintained a personal banking account in the City National Bank and Trust Company, Chicago, Illinois. He and his wife had a joint account in the First National Bank of Barrington, Illinois. Late in 1939 he also opened an account in the City National Bank and Trust Company under the name of the corporation and subsequently on occasion used checks bearing the corporate name in printed form. He deposited a portion of his income from the J. P. Seeburg Corporation, of which company he was vice-president and director of sales, in the latter account and his income from all sources, together with the farm receipts, in the other accounts. The farming expenses and petitioner's personal living expenses were defrayed indiscriminately out of all three accounts. Insurance was carried on the farm dwelling. Tornado and liability insurance policies were carried on the machinery in petitioner's name. Petitioner paid the premiums on these policies which were billed to him. Due to the war, petitioner's income derived from the J. P. Seeburg Corporation was suddenly cut off in 1942, and he was also unable to meet the wages then available elsewhere *125 to farm laborers. As a result, he was forced to auction off the livestock and farm equipment in separate dispersal sales in that year. A check in the amount of $5,578.54, made payable to the petitioner, was received in connection with the dispersal sales. On December 3, 1942, the shareholders and board of directors, by special meetings, approved the reconveyance of the farm to petitioner and his wife. The corporation was dissolved on January 20, 1943, and the farm was finally sold. During the taxable years 1938, 1939, and 1940, the business of farming was conducted solely by the petitioner in his individual capacity and the money lost in such operations was his own and not that of the corporation. In this same period Pomeroy Farms, Inc., held title to the farm property but did not engage in the farming business. In his individual income tax returns for the taxable years 1938, 1939, and 1940, petitioner reported the gross farm receipts to be $1,700, $2,500, and $7,722, respectively. With respect to the $1,700 reported for 1938, respondent held $141.71, receipts derived from December 8, 1938 to December 31, 1938, to be allocable to the corporation. The following facts and amounts *126 relative to losses sustained in the operation of the farm have been stipulated by the parties in response to an order of this Court providing that unless a stipulation of facts was submitted covering the amounts of certain disputed farm losses, the cause would be set down for further hearing: 1938
Dec. 6-31
1939
1940
Ordinary, necessary expenses:
$1,194.59
$14,637.83
$27,348.14
Repairs: Farm property
2.64
245.82
3,228.04
Farm dwelling
210.00
Depreciation: *
Dwelling
8.04
206.44
206.44
Farm buildings
40.18
790.71
882.58
Farm equipment
72.00
890.13
996.31
Farm animals
60.00
922.25
3,355.30
Interest: Farm mortgages
1,210.00
1,245.82 **
Insurance: Farm property
811.09
811.09
Farm dwelling
90.00
90.00
Receipts: Farm produce
141.71
2,500.00
8,431.00
Issue No. *127 2 - Rental Value of Living Quarters In 1939 and 1940 petitioner resided in a dwelling located on the farm and during this period he actively directed and supervised farming operations and also had charge of the buildings and equipment located on the farm and owned by Pomeroy Farms, Inc. Respondent, in his deficiency notice, added to petitioner's reported income for 1939 the amount of $700 and for 1940 the amount of $1,200, representing the "rental value of the home and services received by you from Pomeroy Farms, Inc." Issue No. 3 - Taxes and Interest Respondent has disallowed deductions claimed by petitioner in 1939 for real estate taxes in the amount of $250, truck licenses of $31, and gasoline taxes of $30. Deductions of $314.93 for real estate taxes and $35.50 for truck licenses claimed in 1940 were disallowed. Two claims for interest payments, $1,210 in 1939 and $1,245.82 in 1940, were also held not deductible by respondent. Issue No. 4 - Travel and Entertainment During the taxable years petitioner was employed by the J. P. Seeburg Corporation as its vice-president and director of sales. Seeburg manufactured automatic coin machines used to provide music in taverns, *128 drugstores, and other locations where people congregate. When petitioner became associated with Seeburg in 1937, it did not have sufficient gross sales to warrant a distributing organization on a national scale. In later years the machines were sold at a discount to independent distributors located in the large metropolitan cities, including San Francisco, New York, Boston, Philadelphia, Louisville, Cincinnati, Dallas, Detroit, Cleveland, Chicago, Minneapolis, and Seattle. The distributors, in turn, sold the Seeburg products to individual operators who installed them in public places and split the "take" with the owners of the various establishments. Petitioner's compensation was based on gross sales and net profits, whereby he received one-half of one per cent of the gross sales and five per cent of the net profits. In expanding the sales volume of Seeburg, it was necessary for petitioner to visit the various distributors and operators from time to time, not only to induce increased orders for machines but also to improve their own sales and operating techniques. In 1938 petitioner spent about 75 per cent of his time traveling from city to city, establishing distributorships and *129 holding sales meetings. During the years 1938 to 1940, inclusive, he visited each of the 50 distributors at least once and those in the larger cities several times. During the course of these trips in the taxable years, petitioner incurred not only traveling expenses but did considerable entertaining of prospective jobbers. The latter expenses were incurred by the renting of hotel rooms in which dinners and drinks were provided for a substantial number of potential local operators, sometimes numbering 200. In addition to the entertainment provided while on the road, petitioner also entertained visiting distributors in Chicago. Principally as a result of petitioner's activities, the gross business of Seeburg Corporation increased from $2,000,000 in 1937 to $7,000,000 in 1940. Petitioner maintained no books of account or other records which would reflect the number, nature, time or duration of the trips on behalf of Seeburg, or the amounts expended thereon for entertainment. Petitioner's employer provided him with a monthly allowance for traveling and entertaining expenses which totaled $6,249.94 in 1938, $4,999.92 in 1939, and $5,000 in 1940. In his individual income tax returns *130 for 1938 and 1939, petitioner reported $48,447.86 and $60,009.42 as compensation received from Seeburg in those respective years. He did not include the allowances above mentioned in his gross income, nor did he claim any deductions for traveling and entertaining expenses paid by him. Respondent, in determining the deficiencies for 1938 and 1939, held that petitioner received allowances of $6,249.94 in 1938, and $4,999.92 in 1939, from Seeburg. He allowed automobile depreciation, gasoline, oil, and maintenance expenses for both years, totaling $647.06 for 1938, and $812.70 for 1939, and restored the balance of the allowances to income. Petitioner reported $85,105.65 in his 1940 return as compensation received from Seeburg in 1940. In a schedule attached to his return, he stated that his total compensation actually amounted to $89,705.65; that he expended $9,600 for traveling and entertaining expenses; that he received a $5,000 allowance from the corporation, and that his reported income represented the total compensation, less the amount of expense, $4,600, not reimbursed by Seeburg. Respondent allowed $989.28 of the claimed business expense, consisting of $589.28 for automobile *131 depreciation and $400 for gasoline, oil, and maintenance costs. Petitioner's expenditures to meet his traveling and entertaining expenses amounted to the sums respondent determined as having been received by petitioner from Seeburg of $6,249.94 in 1938 and $4,999.92 in 1939. Petitioner incurred and paid expenses for travel and entertainment in 1940 in the amount of $5,000. Issue No. 5 - Unidentified Bank Deposits In 1935 petitioner's father and mother died in Rochester, New York, leaving an estate for petitioner, which was converted into cash of approximately $20,000. Instead of immediately depositing this money in the bank, petitioner kept it in a strong box, together with other funds which totaled approximately $25,000. When he became associated with Seeburg in 1937, some of this money was used to defray living and traveling expenses. Respondent determined that $51,373.80 had been deposited by petitioner in the City National Bank and Trust Company of Chicago during the first 11 months of 1938, of which $38,031.14 represented commission income and expense allowances from Seeburg, and $1,192 constituted farm receipts. He also determined that bank deposits by petitioner in the *132 three bank accounts during 1939 totaled $78,169.06, of which $62,614.64 was identified as commissions and allowances from Seeburg. With respect to 1940, respondent concluded that $91,343.05 of $95,711.62 deposited by petitioner in the City National Bank and Trust Company in Chicago during 1940, represented similar payments by Seeburg. In determining the instant deficiencies, respondent therefore increased petitioner's taxable net income for 1938, 1939, and 1940 by the differences of $12,150.66, $15,554.42, and $4,368.57, respectively, alleged to represent unidentified bank deposits. The amended petition filed herein assigned as error the addition of only $11,450.66 and $15,004.42 in the taxable years 1938 and 1939, respectively, but assigned the addition of the full amount of $4,368.57 for 1940 as error. Issues Nos. 6 and 7 - Contributions and Bad Debt Respondent disallowed all the deductions for 1938, 1939, and 1940 claimed by petitioner for contributions in those years, but allowed a donation of $182.50 to Saint Chrysostom's Church of Chicago, Illinois, in 1939 which was unclaimed. Petitioner contributed $200 to the Women's Little Symphony and $200 to the Red Cross in 1940. *133 Petitioner loaned $1,000 to one Jacobson in 1939 to help him get started in business. Jacobson committed suicide in the fall of that year. Petitioner was informed by one of the decedent's associates that the stock and machinery were reclaimed by the original vendors and that the remaining assets of his estate, if any, were distributed to his wife and children. Respondent disallowed a deduction of $1,000 claimed by petitioner in his 1939 income tax return as an uncollectible bad debt. Opinion Issue No. 1 - Losses from Farm Operations The principal issue before us in this proceeding is whether certain net operating losses incurred in the operation of a farm should be ascribed to Pomeroy Farms, Inc., or may be claimed as a deduction by its owner and sole stockholder, H. T. Roberts. Petitioner claims that he operated the farm business as an individual and, therefore, the losses derived from such operation were his own. Respondent submits that the corporation was formed for a purpose the "equivalent of business activity", that its organization was followed by the conduct of business, and that such business was substantially the same farm operation as claimed by petitioner as the *134 source of his losses. On the basis of this reasoning, the respondent has disallowed the losses claimed by petitioner and has held that the losses were those of the corporation and may be claimed only by it. The respondent relies principally on the statement of the Supreme Court in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, wherein the Court said: "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." The Circuit Court of Appeals in the Moline case (131 Fed. (2d) 389) stated that: "Ordinarily a corporation and its stockholders are for purposes of taxation held to be separate entities, and the rule is not changed by the mere fact that one person owns all or substantially all of the stock of the corporation." In the instant case, both parties *135 have insisted that the separate corporate existence of Pomeroy Farms, Inc., be preserved. Once the separate existence of a corporation and its sole stockholder is recognized, it is obvious that each must be taxed on the basis of its own business activity. The profits and losses are taxable only to that entity which conducts the business from which they arise. The issue herein consequently is narrowed to the question which of the two entities, Pomeroy Farms, Inc., or H. T. Roberts, conducted the farming operations and is entitled to the losses thereby sustained. It is the contention of petitioner that Pomeroy Farms, Inc., was formed simply to hold title to farm property and that the farming business was to be conducted by himself individually. If this relationship between the corporation and Roberts so existed at the time of its organization and each thereafter restricted its activities to its own sphere, it is clear that the losses from the farm business were deductible only by the petitioner. Numerous cases have involved corporations formed solely to hold title to property where the command *136 over income from the use of the property has been reserved to or vested in another person. In regard to the tax aspect of such holdings, it has been stated repeatedly that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid." Corliss v. Bowers, 281 U.S. 376, 378; cf. Worth Steamship Corp., 7 T.C. 654; Eugene C. Eppley, 25 B.T.A. 300. This distinction between taxability of "ownership" and "use" of property was dealt with specifically in Albert Nelson, 6 T.C. 764, wherein it was stated: "Income may be derived from dealings in property growing out of the 'ownership' or the 'use' of such property. Ownership may be in one person and the right to the use of the same property may be in another, with income flowing to each. To one it would be income growing out of the ownership of such property and to the other income growing out of the use of such property. Although legal title to the hotel property was in petitioner's wife, it does not follow that she was entitled in 1941 to the income growing out of the use thereof. *137 " It is our conclusion, based on the facts as we have found them, that Pomeroy Farms, Inc., simply held title to the farm property, the role for which it was originally organized, that Henry T. Roberts individually conducted the farming operations, and the losses therefrom were properly deductible by him. From the date the farm was purchased by Roberts until Pomeroy Farms, Inc., was incorporated on December 6, 1938, farming operations were carried on by Roberts in his individual capacity. There can be no doubt that it was the intention of the parties involved that Roberts was to continue such operations. A pre-organization subscription agreement signed by petitioner, his wife, and three accommodation parties stated that the farm business was not in any sense to be a corporate enterprise other than the naked holding of title to the personalty and realty by the corporation. It further expressly provided that the operation of the farm, the sale and exhibition of livestock, and all other business matters were to be carried on by Henry T. and Fay C. Roberts. The intention that the newly-formed corporation was organized solely for the purpose of holding title to the farm conveyed to *138 it by petitioner at the time of its incorporation was reemphasized at the first meeting of the board of directors. The minutes of that meeting stated that the individual business would continue and all matters pertaining to income, disbursements or otherwise, would be maintained by Henry T. Roberts for his personal business account, and that the use of the corporate name should be construed only as the vehicle of operation of his individual enterprise and not otherwise. The corporate records indicate that the petitioner, in addition to the real estate, transferred various items of equipment and 30 hogs to the corporation. No bill of sale has been produced to show the conveyance of such property. The disposition or use of the 30 hogs is not revealed by the record and it may well be that these animals were disposed of along with the remainder of the stock on the farm in 1942. In any event, the fact that petitioner transferred these items to the corporation at the time of its organization in no way indicates that the corporation was intended to operate, or did in fact operate the farm, as the great bulk of the livestock was Roberts' personal property. Following the organization of Pomeroy *139 Farms, Inc., the petitioner traveled extensively for the purpose of purchasing first-class livestock to develop his herds of purebred Berkshire hogs and Hereford cattle. He acquired approximately 300 additional hogs, 75 bulls and heifers, and also added Belgian Percheron horses to his collection of livestock. He personally owned all of these animals, registering the hogs in the American Berkshire Association and the cattle in the American Hereford Association under his own name. By virtue of his close attention to proper breeding, he became a frequent winner at state fairs throughout the country, exhibiting the animals under the name of "Pomeroy Farms, H. T. Roberts". Respondent concedes that petitioner paid the expenses of operating the farm out of his personal funds. He used two of his personal bank accounts for this purpose. A third account was carried in the corporate name but it was used not only as a depositary for his compensation from Seeburg but as a source of funds to meet his personal needs. No books of account were maintained by the corporation. It filed no corporate tax returns. The corporation had no funds of its own during the taxable years except for $5,000 which *140 was borrowed and used, not for the maintenance or care of the livestock, but to defray the cost of repairs on the dwelling occupied by petitioner. Respondent introduced into evidence certain data abstracted from extensive correspondence and some 1,500 invoices for merchandise received in 1939 and 1940, approximately half of which was addressed to "Pomeroy Farms" and the remainder sent to petitioner in his own name. We cannot agree with respondent that this demonstrates the existence of corporate business. Petitioner organized the corporation for the principal purpose of securing to himself the sole use of that name, and was authorized by the corporation to make such use of the name in conducting farm business. Petitioner, having selected the corporate form to suit his own purposes, must accept with such an election the resulting tax disadvantages. Having preserved herein the separate entities of the petitioner as the operator and the corporation as the owner of the farm property, the various deductions must be consistently allocated on that basis. It follows that petitioner may deduct as ordinary and necessary expenses incident to the operation of the farm those items stipulated *141 by the parties. These amounts, $1,194.59 in 1938, $14,637.83 in 1939, and $27,348.14 in 1940, in each year exceed any amount this Court could have determined on the basis of the evidence before it. The receipts from farm produce in the taxable years, $1,700 in 1938, $2,500 in 1939, and $8,431 in 1940, are thus taxable to the petitioner. Respondent has disallowed various deductions claimed by petitioner for repairs on farm property and the farm dwelling; depreciation on the dwelling, buildings, and equipment; and insurance on the dwelling, other buildings, and equipment. It is our conclusion that the aforementioned items cannot be claimed as deductions by the petitioner. The property improved and insured with Roberts' individual funds was owned by the corporation and his expenditures thereon inured to its benefit. What arrangement, if any, existed between the corporation and petitioner, its sole stockholder, is not revealed by the record but it is clear that it was not a lessor-lessee relationship as claimed by petitioner. There was no contract fixing the status and relation of the corporation and Roberts; no fixed term or rent; and no agreement which either obligated or authorized *142 Roberts to undertake these expenditures. It is probable that the sums spent by Roberts on the corporation's property were in the nature of additional capital contributions by its sole stockholder. It has been pointed out that the corporation filed no corporate income tax returns as it had no income. If the moneys spent on the corporate property by Roberts constituted rent, it follows that the corporation had income and should have filed returns. What the relationship between Roberts and the corporation was is of little moment here as the fact remains that he has not shown that his business operations were so related to corporate property as to entitle him to claim depreciation and expenditures for the repair and insurance of such property. The respondent's disallowance of these claims must therefore be sustained. The record, on the other hand, clearly shows that Roberts personally purchased large numbers of hogs, cattle, and other livestock during the taxable years for breeding purposes. This stock was acquired by petitioner with his individual funds, registered by him in his own name, and was entered and exhibited in state fairs under the name of "Pomeroy Farms, H. T. Roberts". *143 The amounts expended for the purchase of breeding and income-producing animals are regarded as investments of capital and depreciation thereon may properly be claimed. [1]Daniel G. Tenney, 42 B.T.A. 1049. Depreciation on these animals, which formed the foundation of his business of breeding and selling purebred stock, may properly be claimed by petitioner in the amounts as stipulated, i.e., $60 in 1938, $922.25 in 1939, and $3,355.30 in 1940. Issue No. 2 - Rental Value of Living Quarters Respondent has included in the petitioner's income for 1939 and 1940 the rental value of the farm residence occupied by petitioner rent-free during those years. Petitioner contends that the rental value was not taxable to him as he paid for his use by making improvements, and, in the alternative, *144 submits that such use was a gift to him from the corporation. No satisfactory proof of either interpretation was produced by the petitioner. The fact confronts us that petitioner occupied rent-free a dwelling owned by the corporation. No contract or other agreement, either express or implied, was shown to have existed to support petitioner's claim that he paid rent by way of making improvements on corporate property. In the absence of a determinative agreement, a gift by the corporation to its stockholder, even where it is family controlled, may not be implied. Chandler v. Commissioner, 119 Fed. (2d) 623. Respondent has asserted that petitioner received the use of these quarters as compensation for services rendered the corporation. The record shows that petitioner did render substantial services connected with the maintenance and improvement of corporate property. Petitioner having produced no satisfactory evidence to show that respondent's addition of such rental value to his income was in error, our conclusion is that the amounts of $700 in 1939 and $1,200 in 1940 were *145 properly included by respondent under the provisions of section 22 (a) as "income received from any source whatever." Charles A. Frueauff, 30 B.T.A. 449. Issue No. 3 - Taxes and Interest Respondent has dissallowed deductions taken for taxes and licenses on farm real and personal property of $311 in 1939 and $350.43 in 1940. In the absence of any agreement between the corporation and petitioner which would indicate that such payments were his personal obligations, this Court must decide this issue on the basis of the general rule that such taxes and licenses may only be deducted by the person upon whom they are imposed. In the instant case, the record shows that at the time such tax payments were made, title to the farm realty and part of the personal property was vested in Pomeroy Farms, Inc. Petitioner having offered no satisfactory proof that by ownership or agreement he was obligated to pay these taxes and therefore entitled to claim such payments as deductions, these items must be disallowed. As for the interest payments of $1,210 in 1939 and $1,245.82 in 1940 made by petitioner on farm mortgages, the same general rule must be applied. Payment by a taxpayer *146 of interest on another's obligation is not deductible by the taxpayer. Elma M. Williams, 3 T.C. 200. There is no evidence that the mortgages on farm property were the obligations of anyone other than Pomeroy Farms, Inc. Having recognized the separate corporate and individual entities herein, the Court must regard the mortgage obligations as those of the corporation, and the payments by Roberts of interest thereon as voluntary loans or gifts to the corporation he organized. Issue No. 4 - Travel and Entertainment Expenses In computing the deficiencies for 1938, 1939, and 1940, respondent added the amounts of $5,602.88, $4,187.22, and $8,610.72 to petitioner's net income, explaining in the statement attached to the notice of deficiency that "no substantiating evidence has been submitted to indicate that you expended the said amounts for traveling and entertainment in connection with business." Petitioner was unable to recall the exact amount of the allowances received from Seeburg in 1938 and 1939, nor did he produce any documentary evidence bearing on the question. In those circumstances, the determination by the respondent of the allowances received, $6,249.94 *147 in 1938 and $4,999.92 in 1939, must be sustained. We are satisfied from the evidence, however, that the allowance received in 1940 was in the amount of $5,000, as alleged by petitioner. Petitioner presented no evidence of amounts expended on specific trips and it does not appear that he maintained any books of account for the purpose of recording these expenses. He did testify in considerable detail, however, as to the circumstances of his selling efforts and we are satisfied that he did incur substantial expenses for transportation, food, lodging, and entertainment. We have considered all the evidence and are convinced that the reimbursements received from Seeburg did not inure to petitioner personally but were spent by him in furtherance of the business, as was alleged. Cohan v. Commissioner, 39 Fed. (2d) 540; Lucien I. Yeomans, 5 T.C. 870; Benjamin Abraham, 9 T.C. 222. Certainly these amounts do not seem unreasonable in relation to the sales produced. Joseph Kahn, 38 B.T.A. 1417. Respondent has granted no allowance for entertainment expenses and has conceded less than $1,000 a year for automobile depreciation and expense. *148 In our judgment, so drastic a disallowance by the respondent of the business expenses in issue was unwarranted. Issue No. 5 - Undentified Bank Deposits Respondent increased petitioner's taxable income for the years 1938, 1939, and 1940 by the amounts of $12,150.66, $15,554.42, and $4,368.57, respectively, as representing unidentified bank deposits. The Commissioner's resort to the taxpayer's bank deposits to establish his income, other evidence lacking, is not unreasonable. Axel Homstrom, 35 B.T.A. 1092. In the present case, respondent has used petitioner's bank deposits, not as a starting point in determining petitioner's income, but to supplement his net income as already accounted for from known sources. There is no suggestion in this case that petitioner had, in the years involved, any sources of income other than those disclosed by the record, i.e., commissions from Seeburg Corporation, farm business receipts, and rental income in 1940. Use of this extraordinary procedure to fix a taxpayer's income is usually resorted to only where inadequate or no records are available or where it is strongly suspected that the taxpayer has received income from undisclosed *149 sources. In the instant case both petitioner's income and the sources thereof have been definitely fixed or stipulated, and application of the bank deposit method seems inappropriate under these circumstances. Petitioner received approximately $20,000 in 1935 as a result of the settlement of his parents' estates. This he kept in a strong box with approximately $25,000 of other funds. He further testified that he cashed checks for visiting distributors during these years and deposited these checks in his bank accounts. He has also suggested that the unidentified deposits could have stemmed, in part, from redeposited funds originally withdrawn to purchase livestock, and returned to the bank when he failed to so purchase. On the facts of the case as a whole, it is our conclusion that petitioner's assignment of error as to the addition of these amounts in his income for the years in question should be sustained. Issue No. 6 - Contributions In his returns for 1938, 1939, and 1940, the petitioner claimed deductions for contributions totalling $500 for each year. Respondent disallowed all reported contributions for these years as not constituting allowable deductions under 23 (o), Internal Revenue Code *150 , but did allow an unreported contribution of $182.50 in 1939 to the Saint Chrysostom's Church of Chicago, Illinois. Petitioner claims the right to deduct contributions totaling $500 made in 1938 to the Women's Little Symphony and Community Fund, a donation of $500 to the former organization in 1939, and a contribution of $100 to "Miscellaneous Charities" in 1940. Petitioner's tax return does not constitute affirmative evidence of the deductions sought, Watab Paper Co., 27 B.T.A. 488, nor can any weight be given to self-serving testimony that the organizations and amounts contributed thereto were correctly set forth in the tax returns. Louis Halle, 7 T.C. 245. Petitioner has offered no testimony or other satisfactory evidence to substantiate his claims for these items, which therefore must be denied for lack of proof. Burnet v. Houston, 283 U.S. 223. With respect to other contributions claimed for 1940, we are satisfied that donations of $200 each to the Women's Little Symphony and the Red Cross were made and that they are properly deductible. Issue No. 7 - Bad Debt The final question is whether petitioner should be permitted to deduct *151 a bad debt in the amount of $1,000 claimed in his return for 1939. The applicable provisions of section 23 (k) of the Internal Revenue Code relating to bad debt deductions are set forth in the margin. [2]
The evidence indicates that petitioner lent $1,000 to a friend in 1939 for use in forming a corporation to conduct his own business, that the latter committed suicide in that year, and petitioner was informed by a third person that the few assets remaining after the reclamation of stock and machinery by the original vendors were given to the decedent's family. No evidence has been submitted showing the nature or extent of the corporate assets available on dissolution, or the personal assets owned by the decedent at his death and subject to the claims of creditors. It does not appear that petitioner actively investigated the possibility of collection *152 after the suicide or that he filed any claim through legal channels in 1939. Not only must a taxpayer prove the existence of a debt but "it yet remains for him to prove that he has exhausted all possibility of obtaining reimbursement". Allen-Bradley Co. v. Commissioner, 112 Fed. (2d) 333. Moreover, the petitioner's belief that the debtor's estate was in bad financial condition is not evidence of worthlessness. American Foundry Co., 11 B.T.A. 575; Akron Auto Garage Co., 1 B.T.A. 1066. Because we are not satisfied that the $1,000 debt became worthless in 1939, we are constrained to uphold the respondent's disallowance thereof. Decision will be entered under Rule 50. Footnotes
*. In computing depreciation for 1939 and 1940, consideration was given to capital improvements of $5,000 in 1939 and $9,000 in 1940. ↩
**. This amount was taken as a separate deduction by petitioner and was the subject of a separate assignment of error. It did not enter into the computation of loss from farm operations claimed on his return.↩
1. Treasury Regulations 94: Art. 23(a)-11. Expenses of Farmers. - * * * Amounts expended in purchasing work, breeding, or dairy animals are regarded as investments of capital, and may be depreciated unless such animals are included in an inventory in accordance with article 22(a)-7. * * *↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which became worthless within the taxable year; * * *.↩